# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**M.D. MODZELEWSKI, R.Q. WARD, J.R. MCFARLANE**
Appellate Military Judges

**UNITED STATES OF AMERICA**

v.

**ALEX J. DURAN**
**PRIVATE FIRST CLASS (E-2), U.S. MARINE CORPS**

**NMCCA 201200440**
**GENERAL COURT-MARTIAL**

**Sentence Adjudged:** 11 June 2012.
**Military Judge:** LtCol Stephen Keane, USMC.
**Convening Authority:** Commanding General, 1st Marine Logistics Group, MarForPac, Camp Pendleton, CA.
**Staff Judge Advocate's Recommendation:** LtCol E.J. Peterson, USMC.
**For Appellant:** LT Gabriel Bradley, JAGC, USN.
**For Appellee:** LT Ann Dingle, JAGC, USN.

**31 January 2014**

---------------------------------------------------------
## OPINION OF THE COURT
---------------------------------------------------------

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

WARD, Senior Judge:

A general court-martial composed of members with enlisted representation convicted the appellant, contrary to his pleas, of attempted murder, maiming, and assault upon a sentry, in violation of Articles 80, 124, and 128, Uniform Code of Military Justice, 10 U.S.C. §§ 880, 924, and 928. The appellant was sentenced to 15 years' confinement, total forfeitures, reduction

to pay grade E-1, and a dishonorable discharge.  The convening authority approved the sentence as adjudged, and, except for the dishonorable discharge, ordered the sentence executed.

The appellant asserts four assignments of error (AOE).[1] First, he asserts that the evidence in the case was neither factually nor legally sufficient to support his convictions, due to his mental illness.  Second, he asserts that the military judge erred by failing to exclude a jailhouse recording showing that the appellant hoped to be released from confinement on an insanity defense under MILITARY RULE OF EVIDENCE 403, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.).  Third, he asserts that his trial defense counsel's failure to request certain genetic testing as potential mitigation evidence constituted ineffective assistance of counsel.  Fourth, he asserts that his Fifth Amendment privilege against self-incrimination was violated when the military judge allowed the Government to introduce evidence from the appellant's RULE FOR COURTS-MARTIAL 706, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.) mental examination as a means of rebutting his mental responsibility defense.

After carefully considering the record of trial and the submissions of the parties, we are convinced that the findings and the sentence are correct in law and fact, and that no error materially prejudicial to the substantial rights of the appellant was committed.  Arts. 59(a) and 66(c), UCMJ.

**Factual Background**

Shortly after midnight on the morning of 20 October 2011, the appellant entered the 7th Engineer Support Battalion headquarters building on board Camp Pendleton, California, and attacked Staff Noncommissioned Officer of the Day, Gunnery Sergeant (GySgt) CA, by striking him with a homemade machete. Two other Marines, Corporal (Cpl) AC and Lance Corporal (LCpl) JP, were also standing duty that evening with GySgt CA. However, both were asleep in the duty hut at the time of the appellant's attack.  Upon hearing a commotion in the passageway outside the duty hut, both Cpl AC and LCpl JP stepped to the door only to see GySgt CA staggering back into the duty hut, bleeding from deep lacerations on his neck and hands.  Once

---

[1] A fifth AOE, originally numbered as AOE IV, was withdrawn by the appellant, through counsel, in the appellant's reply brief.  The appellant cited the Court of Appeals for the Armed Forces' recent opinion in *United States v. Mott*, 72 M.J. 319 (C.A.A.F. 2013) as the basis for his decision to withdraw this AOE.

2

inside, GySgt CA locked the door. The appellant stood outside the duty hut for several moments before fleeing the building.

Cpl AC and LCpl JP attempted to render first aid to GySgt CA and called 9-1-1. Responding to the call, the Camp Pendleton Provost Marshal Office dispatched military police to render aid and apprehend the appellant. Military police soon discovered the appellant in the area and pursued him on foot. The appellant ran through a wide ditch between two buildings and, while standing on the far side of the ditch, proceeded to taunt military police while brandishing his homemade machete. Using pepper spray, a military working dog, and by throwing rocks and other heavy objects at the appellant, military police closed in, subdued, and apprehended the appellant.

**Discussion**

## 1. Mental Responsibility Under R.C.M. 916(k)(1) and (2)

In his first AOE, the appellant argues that his convictions are factually and legally insufficient because his mental illness prevented him from forming the specific intent to kill, and furthermore rendered him unable to appreciate the nature and wrongfulness of his actions. At trial, the military judge instructed the panel on both the affirmative defense of lack of mental responsibility (LMR) under R.C.M. 916(k)(1), and the issue of partial mental responsibility (PMR) under R.C.M. 916(k)(2).[2] Record at 720-24. The appellant now challenges both the sufficiency of the evidence underlying the specific intent element required for the attempted murder offense and the panel's findings rejecting his LMR defense.

We review legal and factual sufficiency of guilty findings *de novo*. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The tests for both are well-known. *Id.*; *United States v. Turner*, 25 M.J. 324, 324-25 (C.M.A. 1987). But the standard for reviewing the panel's finding rejecting the

---

[2] The military judge correctly instructed the panel on the two-tiered voting process required when the affirmative defense of LMR is raised. Record at 721; Appellate Exhibit XIV. R.C.M. 921(c)(4) requires that the panel must first determine whether the prosecution has proven all elements of the offense(s) beyond a reasonable doubt. If the panel members return any guilty findings, then they must determine whether the accused has proven the affirmative defense of LMR by clear and convincing evidence. If a majority of the panel votes that the accused has proven LMR by clear and convincing evidence, then findings of not guilty only by reason of LMR result. However, if the panel does not return such findings, then the defense of LMR has been rejected and the guilty findings remain.

affirmative defense of LMR is perhaps less well-known.  For factual sufficiency, we must determine for ourselves whether the appellant proved LMR by clear and convincing evidence.  *United States v. Martin*, 56 M.J. 97, 104 (C.A.A.F. 2001).  However, when we reviewthe legal sufficiency of the panel's finding on LMR, we apply a "substantial evidence" standard wherein we defer to the panel's decision so long as the record contains "'such relevant evidence as a *reasonable mind* might accept as adequate to support a conclusion . . . .'"  *Id*. at 106 (quoting *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).  In such cases, "an appellate court should reject the jury verdict [on lack of mental responsibility] . . . only if no reasonable trier of fact could have failed to find that the defendant's criminal insanity at the time of the offense was established by clear and convincing evidence."  *Id*. at 107 (citations and internal quotation marks omitted).

At trial, the appellant raised and the military judge instructed the members on the affirmative defense of LMR.  The defense presented testimony from other members of the appellant's unit, medical records documenting his mental health treatment, and expert testimony from Dr. CM, a psychiatrist, who conducted an extensive evaluation of the appellant, reviewed his medical and mental health records, and reviewed the investigative report and the appellant's videotaped interrogation.  Dr. CM testified that he diagnosed the appellant with chronic Post-Traumatic Stress Disorder, atypical psychosis, and major depression.  Record at 543-44.  He testified that in his opinion the appellant was suffering from a severe mental disease or defect that "would have impaired [the appellant's] ability to appreciate the nature of his acts."  *Id*. at 545.  During cross-examination, however, Dr. CM conceded that his opinion focused on the appellant's subjective ability to appreciate the wrongfulness of his actions.  *Id*. at 566, 578-80, 584-85.

In rebuttal, the Government called Dr. TG, a forensic psychiatrist, who testified that only a major psychotic episode would render one incapable of understanding the wrongfulness of one's actions.  He pointed to a number of factors in support of his opinion that the appellant did not suffer from  a major psychotic episode at the time of the incident.  *Id*. at 593-96, 637-38.  Specifically, he pointed to the appellant's detailed recollection of events during his ensuing interrogation and the appellant's taunt to military police that they should just "kill [him] like [he] killed the gunny," as indicative of a level of mental awareness inconsistent with a major psychotic event.  *Id*.

4

at 596.  Furthermore, he cited the appellant's actions in fleeing the scene and evading apprehension as indicating that the appellant understood, at a minimum, that society would view his actions as wrongful.  *Id*. at 641.  The Government also presented Dr. RM, the clinical psychologist who conducted the appellant's mental examination under R.C.M. 706.  Dr. RM testified to the results of the sanity board, specifically that he found the appellant to be mentally competent and able to appreciate the wrongfulness of his actions at the time of the incident.  *Id*. at 658-60; Prosecution Exhibit 120.

Despite the defense evidence, the members found the appellant guilty and further found that he failed to prove that he lacked mental responsibility.  Our task is to evaluate whether "a reasonable jury could have found that [the] appellant failed to meet his burden of proving by clear and convincing evidence" that he was not mentally responsible at the time of his offenses.  *Id*. at 110.  Based on our careful review of the entire record, including the judge's instructions to the members, we conclude that a reasonable panel of members could have found that the appellant failed to carry his burden. Additionally, we ourselves are convinced that the appellant failed to prove by clear and convincing evidence that he lacked mental responsibility at the time of his offenses.  *Id*. at 104.

Finally, we are convinced beyond a reasonable doubt that the appellant indeed formed the specific intent to kill GySgt CA, and we conclude appellant's guilty findings are both legal and factually sufficient.  *Turner*, 25 M.J. at 324-25.

2. The Telephone Call From the Brig and MIL. R. EVID. 403

In his second AOE, the appellant asserts that the military judge erred when he admitted over the defense's MIL. R. EVID. 403 objection a recording of a telephone call the appellant made at the Camp Pendleton Brig while awaiting trial.

While in pretrial confinement, the appellant made a series of calls to a local motorcycle shop where his motorcycle had been repaired.  PE 105.  During one of the calls, the appellant tells "Jimmy," the owner of the shop, that he expects to be released soon because he was going to plead "temporary insanity."  *Id*. at Track 2, 2:29 – 2:41.  This phone call preceded the appellant's evaluation by his expert, Dr. CM.

At trial, defense counsel objected citing a lack of relevance and MIL. R. EVID. 403.  Record at 643.  After a brief

5

discussion between the military judge and counsel, trial defense counsel conceded that "[his] objection is more based on 403." *Id*. He then focused on the potential for confusing the appellant's purported awareness of his mental responsibility defense at trial with the separate but "very important question which is whether or not he was – he was mentally responsible for what happened at the time because of a severe mental disease or defect. And I think when you – when you start blending those two things, you're actually confusing the members." *Id*. at 644.

We review an application of Mɪʟ. R. Evɪᴅ. 403 for an abuse of discretion. *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000). When a military judge conducts a proper Mɪʟ. R. Evɪᴅ. 403 balancing on the record, we will not overturn that decision absent a clear abuse of discretion. *United States v. Stephens*, 67 M.J. 233, 235 (C.A.A.F. 2009). But "[w]here the military judge is required to do a balancing test under M.R.E. 403 and does not sufficiently articulate his balancing on the record, his evidentiary ruling will receive less deference from this court." *United States v. Berry*, 61 M.J. 91, 96 (C.A.A.F. 2005). "[T]he term 'unfair prejudice' in the context of M.R.E. 403 'speaks to the capacity of some concededly relevant evidence to lure the *factfinder* into declaring guilt on a ground different from proof specific to the offense charged.'" *United States v. Collier*, 67 M.J. 347, 354 (C.A.A.F. 2009) (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)).

After agreeing with the trial counsel that the evidence tended to show that the appellant may be fabricating or exaggerating his mental symptoms at trial, the military judge then balanced the probative value against any potential for confusion. Disagreeing with defense counsel, he concluded that the evidence would not cause any confusion for the members in light of the instructions he would provide on mental responsibility. *Id*. at 645. As he articulated his Mɪʟ. R. Evɪᴅ. 403 balancing on the record, we exercise "'great restraint'" in reviewing his ruling. *United States v. Harris*, 46 M.J. 221, 225 (C.A.A.F. 1997) (citing *Government of the Virgin Islands v. Archibald*, 987 F.2d 180, 186 (3d Cir. 1993)). We conclude that the military judge did not abuse his discretion in admitting this evidence. However, even if we adopted the less deferential standard of review urged by the appellant, our conclusion would not change.

Even affording the military judge only "some deference,"[3] we conclude, as did the military judge, that the probative value of this evidence was high: a reasonable inference is that the appellant understood prior to his examination by his expert that being found to be "insane" could result in his speedy release from confinement. This probative value added strength to the Government's attack on the credibility of the affirmative defense since the appellant's telephone call preceded his mental evaluation by his expert witness. Indeed, the trial counsel specifically referenced this during closing argument: "[t]hey want you to base your decision on his mental state on the report of Dr. [CM], who primarily based all of his analysis on that six and a half-hour interview where [the appellant] knew he was being evaluated for an insanity defense that would get him out of the brig." Record at 710-11. The evidence was central to the Government's efforts to rebut the accused's affirmative defense of lack of mental responsibility.

We disagree with the appellant's current contention that this evidence is "probative of nothing" or, at most, negligibly probative of the appellant's mental capacity to stand trial. We also note that, unlike at trial, the appellant now also focuses his argument on unfair prejudice instead of confusion. However, no showing was made before the trial court as to why this evidence was unfairly prejudicial. We find nothing in the record to suggest that this evidence would cause the panel to decide the case improperly, or emotionally, or cause the panel to confuse mental capacity at trial with mental responsibility at the time of the offenses.[4] Balancing the centrality of this

_____

[3] *See Manns*, 54 M.J. at 166 (holding that appellate courts grant less deference when a military judge conducts a MIL. R. EVID. 403 balancing test but fails to articulate the analysis on the record).

[4] During closing argument, trial counsel referenced the appellant's telephone call as evidence undermining the credibility of Dr. CM's evaluation of the appellant and resulting expert opinion. Trial defense counsel did not object. However, following trial counsel's closing argument, the military judge *sua sponte* raised the issue of a limiting instruction because he did not "want the members to think or come away with the impression that the accused necessarily would be immediately released from the brig if this insanity defense prevails." Record at 712. After a brief discussion and with the concurrence of both parties, the military judge recalled the members and advised them that "[they are] not to consider or speculate as to whether or not the [appellant] will or will not be released from confinement if [the members] find to elect mental responsibility for any defense." *Id.* at 714. Contrary to the appellant's characterization, we do not find the military judge's concern and ensuing instruction to be evidence of potential confusion or prejudice relating from this evidence. We presume that the members, in the absence of any contrary evidence, followed this instruction and the military judge's later instructions pertaining to mental responsibility.

7

evidence to the Government's case against the danger of unfair prejudice or confusion of the issues, we decline to disturb the military judge's ruling even under the less deferential review advocated by the appellant.

## 3. Ineffective Assistance of Counsel and Genetic Testing

In his third AOE, the appellant claims that he was denied effective assistance of counsel when his trial defense counsel failed to pursue behavioral genetic testing to present in sentencing. He avers that certain genetic testing for the "low-activity [Monoamine Oxidase (MAOA)] gene" when combined with certain environmental factors, may have revealed that he was genetically predisposed to violence. Appellant's Brief of 14 Mar 2013 at 27-30. Without said genetic testing, he argues, his case in mitigation was negatively impacted.

We analyze the appellant's claim of ineffective assistance of counsel under the test outlined by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on such a claim "an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J. 360, 361-62 (C.A.A.F. 2010) (citing *Strickland*, 466 U.S. at 687) (additional citation omitted).

We begin by presuming that trial defense counsel provided effective assistance throughout the trial unless there is "a showing of specific errors made by defense counsel that were unreasonable under prevailing professional norms." *United v. Davis*, 60 M.J. 469, 473 (C.A.A.F. 2005) (citation omitted); *see also Strickland*, 466 U.S. at 687. The tactical and strategic choices made by defense counsel need not be perfect; instead, they must be judged by a standard ordinarily expected of fallible lawyers. In this regard, an appellant "must surmount a very high hurdle" to prevail on a claim of ineffective assistance of counsel. *United States v. Smith*, 48 M.J. 136, 137 (C.A.A.F. 1998) (citation and internal quotation marks omitted).

When assessing *Strickland*'s first prong, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" 466 U.S. at 689 (citation omitted). Here, we are not convinced that the behavioral genetic testing cited by the appellant is part of "reasonable professional assistance" and that failure to pursue

8

it therefore amounted to deficient performance under *Strickland*.[5] Accordingly, we decline the appellant's invitation to create a presumption that defense counsel must seek behavioral genetic testing in cases involving violent crime or risk a finding of ineffective assistance. We agree with the Government that "[t]he science on the connection between this MAOA gene and aggression is not settled." Government Answer of 15 Jul 2013 at 23. Indeed, the main scientist cited by the appellant in his brief suggests that the practical value of this field of research may not be realized for "10-15 years." Deborah W. Denno, *Courts' Increasing Consideration of Behavioral Genetics Evidence in Criminal Cases: Results of a Longitudinal Study*, 2011 Mich. St. L. Rev. 967, 975 fn. 46 (2011) (quoting Dr. William Bernet, M.D.).

We also note the considerable efforts that trial defense counsel made in presenting the mental health of the appellant first, both as an affirmative defense and, subsequently, as mitigation in sentencing. As explained *infra*, the defense called their expert witness, Dr. CM, who testified at length on the appellant's mental health background, history, and treatment before concluding that the appellant's ability to appreciate the nature and quality or wrongfulness of his acts was "impaired." Record at 503-45. As the military judge later instructed the panel,[6] Dr. CM's extensive testimony was also considered by the

---

[5] In his brief, the appellant argues that state and federal courts are increasingly recognizing behavioral genetic evidence in criminal trials and notes that three federal cases have found trial defense counsel ineffective "when they failed to investigate potentially mitigating behavioral genetics evidence." Appellant's Brief at 33-34. In support, the appellant cites three 9th Circuit capital cases that reviewed the denial of *habeas* petitions and held that trial defense counsel's failure to adequately investigate and present mental health evidence in mitigation fell below prevailing professional norms under ABA guidelines. *Dietrich v. Ryan*, 619 F.3d at 1053-55*, vacated and remanded sub nom Ryan v. Detrich*, 131 S. Ct. 2449 (2011); *Hamilton v. Ayers*, 583 F.3d 1100, 1129-30 (9th Cir. 2009); *Jones v. Ryan*, 583 F.3d 626, 637-40 (9th Cir. 2009), *vacated and remanded sub nom Ryan v. Jones*, 131 S. Ct. 2091 (2011). We believe that these cases stand for the broader proposition that trial defense counsel, in capital cases, must reasonably investigate and present evidence of an accused's mental health in mitigation, and not for the proposition espoused by the appellant, that behavioral genetics testing is the "prevailing professional norm" in cases involving a violent offender.

[6] In instructing the panel on sentencing, the military judge advised that "[a]lthough you have found the [appellant] guilty of the offenses charged and, therefore mentally responsible you should consider as a mitigating circumstance evidence tending to show that the [appellant] was suffering from a mental condition." *Id*. at 789.

members in sentencing.  Moreover, defense counsel recalled Dr. CM in sentencing to testify as to the appellant's amenability to treatment and rehabilitation.  *Id*. at 764-68.

We conclude that the appellant has failed to meet his burden of demonstrating "a showing of specific errors. . . by defense counsel that were unreasonable under prevailing professional norms."  *Davis*, 60 M.J. at 473.

## 4. R.C.M. 706 and the Fifth Amendment

The appellant last asserts that his Fifth Amendment privilege against self-incrimination was violated when the Government introduced his R.C.M. 706 evaluation in order to rebut his LMR defense.  At trial, the military judge admitted over defense objection the rebuttal testimony of Dr. RM, a clinical psychologist who conducted the appellant's R.C.M. 706 mental examination, and the "short-form" summary of his R.C.M. 706 report.  Record at 658-60; PE 120.  Dr. RM. testified that, in his clinical opinion, the appellant was mentally competent both at the time of the offenses and at trial.  Record at 658.[7]

Although MIL. R. EVID. 302(b)(1) provides that no self-incrimination privilege exists when an accused introduces statements or derivative evidence made by an accused during an R.C.M. 706 examination, the appellant seeks to preserve this issue in light of the then recent grant of *certiorari* by the United States Supreme Court in *Kansas v. Cheever*, No. 12-609, Order Granting Certiorari (U.S. Feb. 25, 2013).

On 11 December 2013, the Supreme Court decided *Cheever*.  In that decision, the Supreme Court addressed the question of "whether the Fifth Amendment prohibits the government from introducing evidence from a court-ordered mental evaluation of a criminal defendant to rebut that defendant's presentation of expert testimony in support of a defense of voluntary intoxication."  *Cheever*, 134 S. Ct. at 598.  In a unanimous decision, the Supreme Court reiterated its earlier holding in *Buchanan v. Kentucky*, 483 U.S. 402 (1987):[8]  "The rule of

---

[7] Dr. RM briefly explained the testing and evaluation conducted during the appellant's R.C.M. 706 board and he testified to the board's ultimate findings.  However, he did not testify as to any statements made by the appellant.

[8] In *Buchanan*, the Supreme Court held that that Fifth Amendment did not prohibit the prosecution from introducing evidence from a court-ordered mental examination of the accused for the limited purpose of rebutting the affirmative defense of extreme emotional disturbance.  483 U.S. at 423-24.

*Buchanan*, which we reaffirm today, is that where a defense expert who has examined the defendant testifies that the defendant lacked the requisite mental state to commit an offense, the prosecution may present psychiatric evidence in rebuttal." *Cheever*, 134 S. Ct. at 601.

Accordingly, we conclude that the military judge's admission of the R.C.M. 706 board's findings, introduced for the limited purpose of rebutting expert testimony offered by the appellant in support of his LMR defense, did not violate the appellant's right against self-incrimination.

## Conclusion

For the reasons stated above, the findings and the sentence are affirmed.

Chief Judge MODZELEWSKI and Judge MCFARLANE concur.

For the Court


R.H. TROIDL
Clerk of Court

11